Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/18/2023 08:09 AM CDT

Tania Gallardo Hernandez, appellant, v.
Emilio I. Martinez Dorantes, appellee.

___ N.W.2d ___

Filed August 18, 2023.    No. S-22-549.

1. **Statutes.** Statutory interpretation presents a question of law.
2. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
3. **Federal Acts: Appeal and Error.** When reviewing a trial court's determination made pursuant to 8 U.S.C. § 1101(a)(27)(J) (2018) of the Immigration and Nationality Act, an appellate court applies the same standard of review ordinarily applied to judicial determinations in the type of action or proceeding in which the determinations were requested.
4. **Divorce: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.
5. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.
6. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
7. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.
8. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

9. **Courts: Minors.** The role of state courts in the special immigrant juvenile status determination is to make the findings of fact necessary to the U.S. Citizenship and Immigration Service's legal determination of the immigrant child's entitlement to special immigrant juvenile status.

10. **Courts: Federal Acts: Minors.** Federal law affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, and abandonment, as well as a child's best interests. But it is not the role of the state court to make a determination as to whether a child will ultimately be eligible for special immigrant juvenile status; that is a determination reserved for the U.S. Citizenship and Immigration Service and the federal government.

11. **Courts: Minors: Evidence.** On a motion for special findings pursuant to Neb. Rev. Stat. § 43-1238(b) (Cum. Supp. 2022), the state court should concern itself only with the determinations that have been requested and are supported by sufficient evidence, and not with the ultimate merits or purpose of the juvenile's application for special immigrant juvenile status.

12. **Jurisdiction: Minors: Child Custody: Evidence.** Pursuant to Neb. Rev. Stat. § 43-1238(b) (Cum. Supp. 2022), if there is sufficient evidence to support special immigrant juvenile status findings, a Nebraska court exercising jurisdiction over an initial child custody proceeding shall issue an order regarding the following determinations, when requested by one of the parties or upon the court's own motion: (1) that the child has been abused, abandoned, or neglected; (2) that reunification with at least one of the child's parents is nonviable due to abuse, abandonment, neglect, or a similar basis under state law; and (3) that it would not be in the child's best interests to be removed from the United States to a foreign country, including the child's country of origin or last habitual residence.

13. **Divorce: Minors: Proof.** When special immigrant juvenile findings are requested in a dissolution action, it is ordinarily appropriate to apply the preponderance of the evidence standard.

14. **Courts: Minors: Evidence.** Courts asked to make special immigrant juvenile status determinations are not required to make determinations favorable to the party seeking them, and may conclude that there was insufficient evidence to support such determinations or that the evidence adduced was not credible.

15. **Trial: Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

16. ____: ____: ____. The exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection.

17. **Trial: Evidence: Testimony.** Where the information contained in an exhibit is, for the most part, already in evidence from the testimony of witnesses, the exclusion of the exhibit is not prejudicial.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Affirmed.

Anna D. Deal, of Immigrant Legal Center, an affiliate of the Justice for Our Neighbors Network, for appellant.

No appearance for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

## I. INTRODUCTION

In this dissolution case, the mother requested sole legal and physical custody of the parties' minor child, and she also asked the dissolution court to make specific findings to support an application to obtain special immigrant juvenile (SIJ) status for the child under 8 U.S.C. § 1101(a)(27)(J) (2018) of the Immigration and Nationality Act. The court awarded the mother sole custody and made some, but not all, of the requested SIJ findings. The mother timely appealed to challenge the SIJ findings, and we moved this case to our docket on our own motion.[1] On this record, we find no abuse of discretion regarding the SIJ findings, and affirm.

## II. BACKGROUND

Tania Gallardo Hernandez (Tania) and Emilio I. Martinez Dorantes (Emilio) were married in Mexico. The parties' only child, Max, was born in Mexico in December 2016. Max has been diagnosed with hydrocephaly and spina bifida. In 2018, Tania moved with Max to the United States to seek specialized treatment for his medical conditions. Emilio joined

---

[1] See Neb. Rev. Stat. § 24-1106 (Cum. Supp. 2022).

Tania and Max in the United States sometime in 2019. They lived together for a period of time in Omaha, Nebraska, but in 2020, Tania and Emilio separated.

### 1. Complaint for Dissolution

In July 2021, Tania filed, pro se, a complaint for dissolution of marriage in the district court for Douglas County. Her complaint requested sole legal and physical custody of Max. Emilio was personally served with the complaint on July 22, 2021, but he never filed an answer.

Apparently, pursuant to local "Court Rule 4.3," the court referred the case to the conciliation court in Douglas County for the parties to complete parenting classes and mediate a parenting plan. The transcript includes a filing titled "Parenting Plan Disposition" filed by the conciliation court, stating that Tania attended the required parenting class in December 2021 and that Emilio "attended parent education class but did not pay." Attached to this filing is a document dated March 25, 2022, and titled "Default Parenting Plan Rule 4.3," which states:

[Emilio] (defaulting parent) is in default for failing to comply with Court Rule 4.3 requiring participation in the parent education class and mediation for purpose of establishing a parenting plan. [Tania] (custodial parent) shall have custody of the minor child/ren of the parties. The visitation and parenting time of [Emilio] (defaulting parent) shall be at the sole discretion of [Tania] (custodial parent) until such time as [Emilio] (defaulting parent) complies with Rule 4.3 by attending the parent education class and by either mediating or negotiating a parenting plan, which has been approved by the Conciliation Court and Mediation Services.

In April 2022, the Immigrant Legal Center entered an appearance as Tania's counsel of record and filed a notice setting the dissolution for final hearing on April 27, 2022. The notice of hearing advised that Tania "intends to seek

special findings, to be requested in a forthcoming motion, with respect to whether her minor child's reunification with [Emilio] is viable and whether return to Mexico would be in the child's best interest."

## 2. Motion for Special Findings

In April 2022, Tania filed a motion asking the court to issue "an order containing special findings in support of her minor child's eligibility for [SIJ] Status." As authority for this request, the motion relied on 8 U.S.C. § 1101(a)(27)(J) of the Immigration and Nationality Act and Neb. Rev. Stat. § 43-1238(b) (Cum. Supp. 2022). The relevant provisions of both statutes are set out in the analysis section of this opinion.

Tania's motion asked that the following SIJ findings be incorporated into the dissolution decree:

1. The minor child's reunification with [Emilio] is not viable due to abuse, neglect, abandonment, or a similar basis found under state law within the meaning of Section 101(a)(27)(J) of the INA;

2. [Emilio] has neglected the minor child . . . as defined in Neb. Rev. Stat. § 28-710(2)(b)(i) and (iii) [(Cum. Supp. 2022)], in that [he] has knowingly, intentionally, or negligently caused or permitted Max to be placed in a situation that endangers his . . . physical or mental health, and to be deprived of necessary food, clothing, shelter, or care. [Emilio] verbally and physically abused [Tania] in the minor child's presence, including threatening and attacking her with a knife. [Emilio] also abused alcohol and drugs in the presence of the minor child. Since December 2020, when [Tania] and [Emilio] separated, [Emilio] has not provided any economic or emotional support for the child or maintained a parent-child relationship. [Tania] alone has provided for Max's physical, emotional, medical, and educational needs.

3. It would not be in Max's interest to return to Mexico, his country of nationality, within the meaning

of Section 101(a)(27)(J) of the INA. Max has significant disabilities due to congenital conditions including hydrocephaly and spina bifida. In Mexico, he would be without parental support and care and would lack access to the medical treatment, therapy, and special education services he requires to survive and reach his full potential.

The record shows that Tania served Emilio with the notice of hearing and a Spanish translation of the motion for SIJ findings.

### 3. Final Hearing

On April 27, 2022, the district court held a final hearing on the complaint for dissolution and took up the motion for special SIJ findings. Emilio appeared pro se, and Tania appeared with counsel of record. Although the parties had not reached a formal settlement agreement, the record shows there was no dispute that the marriage was irretrievably broken, that Tania should have sole custody of Max, that Tania did not want child support, and that the parties had already divided all their marital property. The evidence thus focused primarily on Tania's requested SIJ findings. The court received several exhibits and heard testimony from both parties, each of whom testified through a Spanish interpreter.

### (a) Tania's Testimony

As relevant to the issues on appeal, Tania testified that when Max was born in Mexico City, Mexico, Emilio was working in Acapulco, Mexico, and did not earn enough to support the family. No specific evidence was adduced about Emilio's earnings or earning potential, either historically or currently. Tania testified that Max was hospitalized for 3 months after his birth and has required several additional hospitalizations and surgeries. Tania said she relied primarily on her mother, who resides in the United States, to pay for Max's medical care in Mexico. Tania also testified that Emilio has never participated in Max's daily care and that he did not want to.

According to Tania, she moved with Max to the United States in 2018, in part because of "all the violence in Mexico" but also to receive medical care because Max's doctor in Mexico "said that he couldn't do anything for him." She said Emilio did not want to come to the United States at that point, but he joined them in 2019. After Emilio moved to the United States, Tania said their marital relationship deteriorated. She testified that Emilio became physically, emotionally, and verbally abusive and would use drugs in Max's presence. The parties separated in 2020. Tania testified that since the separation, Emilio has not asked to see Max and has provided no financial support. There is nothing in the record suggesting either party requested temporary orders during the pendency of the dissolution.

At the time of trial, Max was 5 years old. He was attending school, as well as receiving regular medical care and therapy, and Tania described his progress as "really, really good." Max uses a wheelchair and requires assistance with daily activities. Tania offered a letter from one of Max's medical providers that explains that due to his spina bifida, Max is unable to walk or move his legs. He has a neurogenic bladder that requires assistance to be emptied completely and as a result is at greater risk for urinary tract infections. Max has a shunt for his hydrocephalus that requires great care and monitoring, as infections can be life threatening. As a result of his hydrocephalus, Max has speech delays that are being addressed in school. Max has a good prognosis for a full life, but he will continue to require specialized medical care and support.

Tania generally testified that Emilio does not know how to care for Max; he has never fed Max or changed his diaper. Tania said that if Max was placed in Emilio's care she would worry for Max's safety. Tania requested full legal and physical custody of Max. She also testified that it would not be in Max's best interests to return to Mexico, because he would not have access to the medical specialists or the therapy he needs and he would not be able to attend school.

Tania also testified about occasions when she called police to report that Emilio was being physically and verbally abusive toward her. At one point Emilio was arrested and charged with terrorism, and he spent approximately 3 months in jail awaiting trial. Tania said she eventually "drop[ped] the charges" and then petitioned for, and was granted, a domestic abuse protection order against Emilio, on behalf of herself and Max. File-stamped photocopies of the protection order filings and orders were received into evidence. These documents show that Emilio requested a hearing on the ex parte domestic abuse protection order, but then failed to appear so the ex parte order was affirmed. The affidavit attached to Tania's petition detailed several instances of domestic abuse by Emilio against Tania and stated that Max was present when Emilio was threatening Tania with a knife and Emilio "started stabbing the door." The affidavit stated Max was "very afraid and was shaking because he saw everything that happened."

(b) Emilio's Testimony

Emilio did not cross-examine Tania, but he testified briefly in his own behalf. As stated earlier, he did not contest the divorce nor did he contest that Tania should have sole legal and physical custody of Max. Emilio testified that he was working in Acapulco when Tania and Max first came to the United States, and he explained, "I didn't know that they were going to allow . . . her in, that's why I didn't come with them." Emilio said that after he moved to the United States, Tania decided to leave the marriage. He believed Tania had been unfaithful to him because her goal was to obtain U.S. citizenship. According to Emilio, Tania said that "if she couldn't become a citizen with me, she would become a citizen without me." Emilio said he was "giving [Tania] full custody" because he did not have any family in the Omaha area; he was considering moving away to live with his aunts and uncles, but he did not say where. Emilio testified that it was "fine" if Tania wanted him to be "far away from her" but he did not like

that she "threatened to keep me away from my son." He testified that although Tania painted him as a "really bad person," he "never attacked her" and he did not use drugs. Emilio asked the court to "have compassion" for his circumstances, stating: "[P]lease, I don't want anything on my immigration record. I just came here because of my marriage with her. So I just don't want any problems . . . with the authorities, Your Honor."

### 4. Dissolution Decree

At the close of the hearing, the district court made specific findings from the bench. It made the standard findings that the marriage was irretrievably broken and should be dissolved. It also found that Tania should be awarded sole legal and physical custody of Max, that Emilio's parenting time would be "at the discretion of Tania" until he completed the required parenting class, and that no child support would be ordered. As to the requested SIJ findings, the court expressly found it would not be in the child's best interests to return to Mexico, but it declined to make any of the other SIJ findings. The following exchange then occurred between the court and Tania's counsel:

[Counsel for Tania]: Just to confirm, Your Honor, it sounds like your order is not entering findings with respect to [Emilio's] neglect of Max and his — Max's inability to be reunified with [Emilio] at this time due to that neglect; is that correct?

THE COURT: That is correct. I am making the finding that pursuant to the Parenting Plan, that the parenting time would be at her discretion, but if he were to complete the parenting seminar, then he would be able to access and look to and try to get parenting time with Max. This is not a termination of parental rights case, so I am not making that finding against [Emilio]. But I am making findings that it would be in the best interests of Max to remain here in the United States for his

safety, as well as his medical and as well as his educational needs.

[Counsel for Tania]: Okay. We are not seeking a termination of parental rights. . . . We are seeking a finding that [Emilio] has neglected Max, and that Max cannot be reunified with [Emilio] at this time due to such neglect. So if you feel the evidence does not support that finding, then that's fine.

THE COURT: That is correct.

[Counsel for Tania]: In the alternative, Your Honor, would you find that reunification is not viable based on abandonment because the father has not been involved in the child's care or maintenance?

THE COURT: I'm not willing to make that finding.

On May 2, 2022, the district court entered a dissolution decree that memorialized the findings announced from the bench. The decree gave Tania sole legal and physical custody of Max. The court attached and incorporated the "Default Parenting Plan" referenced earlier, and it expressly found such parenting plan "complies with the Parenting Act and is in the best interest of the minor child."

As relevant to the request for SIJ findings, the decree stated:

The Court finds that it would not be in Max's interest to return to Mexico, his country of nationality. Max has significant disabilities due to congenital conditions including hydrocephaly and spina bifida. In Mexico, he would be without parental support and care and would lack access to the medical treatment, therapy, and special education services he requires to survive and reach his full potential.

## 5. Motion to Alter or
### Amend Decree

Tania filed a timely motion to alter or amend the decree, asking the court to include in the decree "specific findings of fact regarding the best interest of the minor child, including

that the child's reunification with [Emilio] is not viable at this time due to [Emilio's] neglect." The brief Tania submitted in support of this motion is in the appellate transcript, and it argued primarily that there was sufficient evidence in the record to support a finding that Max's reunification with Emilio was not viable due to neglect. The district court denied Tania's motion without elaboration in an order entered July 11, 2022.

Tania filed a timely notice of appeal, and we moved the case to our docket. Emilio has not filed a brief on appeal and is in default.

## III. ASSIGNMENTS OF ERROR

Tania recites six assignments of error that can be consolidated and restated into two: (1) The district court erred by refusing to make the requested SIJ determinations pursuant to 8 U.S.C. § 1101(a)(27)(J) and § 43-1238(b), and (2) the district court erred in excluding exhibit 3, which was styled as an unsworn, unnotarized "declaration" signed by Tania.

## IV. STANDARD OF REVIEW

[1,2] Statutory interpretation presents a question of law.[2] An appellate court independently reviews questions of law decided by a lower court.[3]

We have not expressly articulated a standard of review for appeals from a trial court's determination made pursuant to 8 U.S.C. § 1101(a)(27)(J) of the Immigration and Nationality Act. In most of our prior decisions, the primary issue on appeal concerned the trial court's jurisdiction and authority to make such determinations.[4] In the few appeals addressing the

---

[2] *McGill Restoration v. Lion Place Condo. Assn.*, 313 Neb. 658, 986 N.W.2d 32 (2023).

[3] *Charter West Bank v. Riddle, ante* p. 263, 989 N.W.2d 428 (2023).

[4] See, *Sabino v. Ozuna*, 305 Neb. 176, 939 N.W.2d 757 (2020); *In re Guardianship of Luis J.*, 300 Neb. 659, 915 N.W.2d 589 (2018); *In re Guardianship of Carlos D.*, 300 Neb. 646, 915 N.W.2d 581 (2018). See, also, *Francisco v. Gonzalez*, 301 Neb. 1045, 921 N.W.2d 350 (2019).

merits of the trial court's determination made pursuant to the federal statute, the applicable standard of review was generally dependent upon the type of action or proceeding in which the determinations were requested.[5]

[3] We now hold that when reviewing a trial court's determination made pursuant to 8 U.S.C. § 1101(a)(27)(J) of the Immigration and Nationality Act, an appellate court applies the same standard of review ordinarily applied to judicial determinations in the type of action or proceeding in which the determinations were requested.

[4-7] Here, Tania appeals from the decree issued by the district court in a marital dissolution. In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.[6] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[7] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[8] When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[9]

---

[5] See, *In re Interest of Luis G.*, 17 Neb. App. 377, 764 N.W.2d 648 (2009) (juvenile case); *Mejia Ramirez v. Mercado Bautista*, No. A-19-908, 2020 WL 2730967 (Neb. App. May 26, 2020) (selected for posting to court website) (marital dissolution); *In re Guardianship of Jaime G.*, No. A-16-895, 2017 WL 4269830 (Neb. App. Sept. 26, 2017) (selected for posting to court website) (probate case). Cf. *Sabino v. Ozuna, supra* note 4 (marital dissolution).

[6] *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021).

[7] *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023).

[8] *Parish v. Parish, ante* p. 370, 991 N.W.2d 1 (2023).

[9] *Parde v. Parde, supra* note 7.

[8] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[10]

## V. ANALYSIS

### 1. Overview of SIJ Procedure

We begin with an overview of the SIJ procedure. Under 8 U.S.C. § 1101(a)(27)(J) of the federal Immigration and Nationality Act, SIJ status provides certain immigrant children the ability to seek lawful permanent residence in the United States. It is a unique form of immigration relief in that the application process requires determinations made by both the state courts and the federal government.[11] Generally speaking, the application for SIJ status involves a two-step process.

To be eligible for SIJ status, a petitioning juvenile must first obtain certain determinations from a state "[j]uvenile court."[12] Federal regulation defines "[j]uvenile court" as "a court located in the United States that has jurisdiction under State law to make judicial determinations about the dependency and/or custody and care of juveniles."[13] In Nebraska, a dissolution court with jurisdiction to determine custody of a child also has jurisdiction to make SIJ determinations regarding such child.[14] By federal statute and regulation, the state juvenile court—rather than the U.S. Citizenship and Immigration Services (USCIS), the federal adjudicating entity—is designated as the appropriate forum for child welfare determinations regarding abuse, neglect, and abandonment, as well as determination

---

[10] *State v. Lorello, ante* p. 385, 991 N.W.2d 11 (2023).

[11] See, 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11 (2023).

[12] 8 C.F.R. § 204.11(a).

[13] *Id.*

[14] See *Sabino v. Ozuna, supra* note 4. See, also, § 43-1238(b).

of a child's best interests.[15] In pertinent part, 8 U.S.C. § 1101(a)(27)(J) defines a "special immigrant" as:

[A]n immigrant who is present in the United States—

(i) *who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;*

(ii) *for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence;* and

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status . . . .

(Emphasis supplied.) Federal regulation instructs that the italicized language above reflects the determinations to be made by the state juvenile court, when there is sufficient evidence, as the first step in the SIJ procedure.[16]

The second step in the SIJ procedure requires the juvenile to file a petition with USCIS that includes the state court's determinations, after which USCIS conducts a plenary review,[17] and makes the final determination regarding SIJ status.[18] Federal regulations governing such review are contained in 8 C.F.R. § 204.11(c), which provides, in part:

***Juvenile court order(s)—***

---

[15] See, generally, 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

[16] See, generally, 8 C.F.R. § 204.11(c).

[17] See, generally, 8 C.F.R. § 204.11(d).

[18] See 8 C.F.R. § 204.11(b)(5).

(1) *Court-ordered dependency or custody and parental reunification determination.* The juvenile court must have made certain judicial determinations related to the petitioner's custody or dependency and determined that the petitioner cannot reunify with their parent(s) due to abuse, neglect, abandonment, or a similar basis under State law.

(i) The juvenile court must have made at least one of the following judicial determinations related to the petitioner's custodial placement or dependency in accordance with State law governing such determinations:

(A) Declared the petitioner dependent upon the juvenile court; or

(B) Legally committed to or placed the petitioner under the custody of an agency or department of a State, or an individual or entity appointed by a State or juvenile court.

(ii) The juvenile court must have made a judicial determination that parental reunification with one or both parents is not viable due to abuse, abandonment, neglect, or a similar basis under State law. The court is not required to terminate parental rights to determine that parental reunification is not viable.

(2) *Best interest determination.*

(i) A determination must be made in judicial or administrative proceedings by a court or agency recognized by the juvenile court and authorized by law to make such decisions that it would not be in the petitioner's best interest to be returned to the petitioner's or their parent's country of nationality or last habitual residence.

(ii) Nothing in this part should be construed as altering the standards for best interest determinations that juvenile court judges routinely apply under relevant State law.

(3) *Qualifying juvenile court order(s).*

(i) The juvenile court must have exercised its authority over the petitioner as a juvenile and made the requisite

judicial determinations in this paragraph under applicable
State law to establish eligibility.

Federal regulations state that a juvenile court's order should
include the factual basis for any determinations.[19] If SIJ status
is approved by USCIS, the juvenile can apply for legal permanent residence in the United States.

## 2. State Law and SIJ Findings

As additional background, we next review the Nebraska
legislation implemented to support the federal SIJ procedure. In 2018, the Legislature amended Nebraska's version
of the Uniform Child Custody Jurisdiction and Enforcement
Act to clarify that Nebraska courts with jurisdiction over an
"initial child custody determination" as that term is used in
§ 43-1238(a) also have jurisdiction and authority to make special findings of fact similar to those contemplated by 8 U.S.C.
§ 1101(a)(27)(J).[20] As relevant here, § 43-1238(b) provides:

> In addition to having jurisdiction to make judicial determinations about the custody and care of the child, a court
> of this state with exclusive jurisdiction under subsection
> (a) of this section has jurisdiction and authority to make
> factual findings regarding (1) the abuse, abandonment, or
> neglect of the child, (2) the nonviability of reunification
> with at least one of the child's parents due to such abuse,
> abandonment, neglect, or a similar basis under state law,
> and (3) whether it would be in the best interests of such
> child to be removed from the United States to a foreign
> country, including the child's country of origin or last
> habitual residence. If there is sufficient evidence to support such factual findings, the court shall issue an order
> containing such findings when requested by one of the
> parties or upon the court's own motion.

---

[19] 8 C.F.R. § 204.11(d)(5)(i).

[20] See *In re Guardianship of Carlos D., supra* note 4.

Although the elements recited in § 43-1238(b) do not precisely track the language of the federal SIJ statute, we have said that § 43-1238(b) "clarifies that courts with jurisdiction over an 'initial child custody determination' as that term is used in § 43-1238(a) also have jurisdiction and authority to make special findings of fact similar to those contemplated by 8 U.S.C. § 1101(a)(27)(J)."[21]

[9,10] With this overview in mind, we take this opportunity to emphasize the limited role of the Nebraska courts with respect to a juvenile's motion for special SIJ determinations under 8 U.S.C. § 1101(a)(27)(J). In our most recent opinion addressing a motion for SIJ findings, we said that the role of state courts in the SIJ status determination is to make the findings of fact necessary to USCIS' legal determination of the immigrant child's entitlement to SIJ status.[22] We explained that federal law affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, and abandonment, as well as a child's best interests. But we observed it is not the role of the state court to make a determination as to whether a child will ultimately be eligible for SIJ status; that is a determination reserved for USCIS and the federal government.[23] We adhere to that articulation and supplement it here.

[11] Because the federal courts have exclusive jurisdiction over immigration status, the merits of a juvenile's application for SIJ status, if any, will be determined in immigration proceedings in accordance with federal law. Therefore, when presented with a motion for special findings pursuant to § 43-1238(b), the state court should concern itself only with the determinations that have been requested and are supported by sufficient evidence, and not with the ultimate merits or purpose of the juvenile's application for SIJ status.

---

[21] *Id.*, 300 Neb. at 654, 915 N.W.2d at 586.

[22] *Sabino v. Ozuna, supra* note 4.

[23] *Id.*

[12] Pursuant to § 43-1238(b), if there is sufficient evidence to support requested SIJ findings, a Nebraska court exercising jurisdiction over an initial child custody proceeding shall issue an order regarding the following determinations, when requested by one of the parties or upon the court's own motion: (1) that the child has been abused, abandoned, or neglected; (2) that reunification with at least one of the child's parents is nonviable due to abuse, abandonment, neglect, or a similar basis under state law; and (3) that it would not be in the child's best interests to be removed from the United States to a foreign country, including the child's country of origin or last habitual residence.

Section § 43-1238(b) does not specify the quantum of proof to be used when determining whether the evidence is sufficient to support any requested SIJ findings. Similarly, the federal statute and supporting regulations are silent on the quantum of proof to be applied, although the regulations generally recognize that juvenile courts should apply state law standards when making the various SIJ determinations.[24]

In the instant appeal, Tania does not advocate for the adoption of any particular quantum of proof, but she generally argues that she proved Emilio's neglect by a preponderance of the evidence. We have not expressly endorsed a particular quantum of proof for the findings authorized by § 43-1238(b), but in *Sabino v Ozuna*,[25] we observed that state courts in other jurisdictions have cautioned against placing "insurmountable evidentiary burdens on SIJ petitioners, because those seeking that status will have limited abilities to corroborate testimony with additional evidence." Other state appellate courts to have considered the issue hold it is appropriate to apply a preponderance of the evidence standard to SIJ determinations.[26]

---

[24] See, generally, 8 C.F.R. § 204.11(c).

[25] *Sabino v. Ozuna, supra* note 4, 305 Neb. at 183, 939 N.W.2d at 762.

[26] See, e.g., *Guardianship of Saul H.*, 13 Cal. 5th 827, 514 P.3d 871, 297 Cal. Rptr. 3d 86 (2022); *Romero v. Perez*, 463 Md. 182, 205 A.3d 903 (2019); *Matter of Guardianship of B.A.A.R.*, 136 Nev. 494, 474 P.3d 838 (2020).

[13] Our cases generally recognize that "[u]nless an exception applies, the burden of proof in civil cases requires only the greater weight of the evidence."[27] Therefore, absent a statute requiring application of a different evidentiary standard, we agree that when SIJ findings are requested in a dissolution action, it is ordinarily appropriate to apply the preponderance of the evidence standard.[28] We apply this familiar standard to our de novo review in this appeal.

### 3. Refusal to Make Requested SIJ Findings

Tania generally assigns that the district court erred by refusing to make all the SIJ findings she requested pursuant to 8 U.S.C. § 1101(a)(27)(J) and § 43-1238(b). As explained above, the court made some, but not all, of the requested findings. Tania's motion arguably requested determinations based on abuse, neglect, and abandonment, but her appellate briefing argues only that the court erred in refusing to find Max was neglected by Emilio, as that term is defined under Nebraska law,[29] and that, due to such neglect, Max's "reunification" with Emilio was nonviable. We limit our analysis accordingly.

Tania argues the evidence was sufficient for the court to conclude Max's reunification with Emilio was nonviable due to neglect, and she assigns error to the refusal to make such

---

[27] *Burgardt v. Burgardt*, 304 Neb. 356, 362, 934 N.W.2d 488, 493 (2019). See, also, *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019) (holding that when statutory scheme does not specify standard of proof, unless exception applies, only preponderance of evidence is required in civil cases).

[28] Accord Neb. Rev. Stat. § 43-2932(1)(a) (Reissue 2016) ("[w]hen the court is required to develop a parenting plan: . . . If a preponderance of the evidence demonstrates, the court shall determine whether a parent who would otherwise be allocated custody [or] parenting time[: h]as committed child abuse or neglect; . . . [h]as committed child abandonment . . . ; [or h]as committed domestic intimate partner abuse").

[29] See Neb. Rev. Stat. § 28-710(2)(b)(i) through (iii) (Cum. Supp. 2022).

a determination. She generally contends the court erred because either it mistakenly assumed that such a finding required termination of parental rights or it assumed it should not make this finding because Emilio still had potential parenting time with Max and could theoretically obtain shared custody of Max by seeking modification. She also argues the court may have mistakenly concluded it had no authority to make the requested finding. We do not find that any of these arguments are supported by the record.

As a threshold matter, we note it is unclear how a state court is to evaluate the viability of "reunification" where, as here, one parent is awarded legal and physical custody of the child and the other is awarded parenting time. But we need not address that issue in this case because, as we explain, we find no abuse of discretion in the dissolution court's determination that there was insufficient evidence to support the requested finding of neglect.

[14] We have previously established that courts asked to make SIJ determinations are not required to make determinations favorable to the party seeking them, and may conclude that there was insufficient evidence or that the evidence adduced was not credible.[30] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[31]

Here, the record shows the district court refused to make the requested SIJ determination regarding neglect because it found the evidence was insufficient. At the hearing, Tania's counsel clarified, "We are seeking a finding that [Emilio] has neglected Max, and that Max cannot be reunified with [Emilio] at this time due to such neglect. So if you feel the evidence does not support that finding, then that's fine." The court responded, "That is correct." The court's determination

---

[30] See *Sabino v. Ozuna, supra* note 4.

[31] *Parish v. Parish, supra* note 8.

that the evidence was insufficient was a proper basis for its refusal to make the requested SIJ determination.[32] Moreover, we are not persuaded by Tania's argument that the court thought it lacked authority to make the requested findings, because it expressly included in the dissolution decree the requested SIJ finding regarding Max's best interests.

At the hearing, the parties presented conflicting testimony regarding neglect. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[33] Here, because the evidence was in conflict, we defer to the district court's implicit determinations regarding the credibility of the evidence presented. Upon our de novo review of the record, we cannot find an abuse of discretion in the court's determination that the evidence was insufficient to make the requested SIJ determination that reunification with Emilio was not viable due to neglect, and we decline to reweigh credibility on appeal.

### 4. Evidentiary Ruling

Tania next assigns error to the court's refusal to accept exhibit 3, so we provide relevant background regarding that exhibit. Exhibit 3 was styled as an unsworn, unnotarized "declaration" signed by Tania. The exhibit contains statements about the parties' marriage, Max's birth and his medical and educational needs, Tania's reasons for moving with Max to the United States, the difficulties that developed in her marriage, the alleged neglect, and specific instances of alleged domestic abuse against Tania.

Emilio objected to exhibit 3 because it was not in Spanish. When the judge asked the court interpreter to translate the exhibit from English to Spanish, she declined, explaining the exhibit was "a very long document to sight translate." Tania's

---

[32] See *Sabino v. Ozuna, supra* note 4.

[33] *Parde v. Parde, supra* note 7.

counsel then told the court that "most of the things" in exhibit 3 would be "stated here in the testimony," after which the court declined to receive that exhibit.

On appeal, Tania asserts it was reversible error to exclude exhibit 3 without providing additional time to prepare a Spanish translation of the document. Tania also argues the court should have continued the hearing to permit a translation to be prepared, although the record shows she did not request a continuance at any point during the hearing. We do not reach the merits of these arguments, because we conclude that even if error could be shown, it would not warrant reversal on this record because Tania cannot show the requisite prejudice.

[15-17] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[34] The exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection.[35] In particular, where the information contained in an exhibit is, for the most part, already in evidence from the testimony of witnesses, the exclusion of the exhibit is not prejudicial.[36]

Here, the relevant information contained within exhibit 3 was presented to the court through Tania's testimony and other exhibits she offered into evidence without objection. At the hearing, the court heard considerable testimony from Tania regarding the parties' marriage, Max's birth and his medical and educational needs, Tania's reasons for moving with Max to the United States, the difficulties that developed in her marriage, and the alleged neglect of Max by Emilio. The court also received as evidence file-stamped photocopies of the protection order filings and orders detailing specific instances of alleged domestic abuse by Emilio against Tania. We conclude

---

[34] *In re Estate of Koetter*, 312 Neb. 549, 980 N.W.2d 376 (2022).

[35] *Marr v. West Corporation*, 310 Neb. 21, 963 N.W.2d 520 (2021).

[36] *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017).

Tania's counsel's statement to the court that "most of the things" in the exhibit would be "stated here in the testimony" is supported by the record and directly contradicts her position on appeal. Moreover, nothing in the record supports Tania's argument that excluding exhibit 3 was unfairly prejudicial to her. This assignment is without merit.

## VI. CONCLUSION

For the reasons set forth herein, we find no merit to Tania's assigned errors and affirm the judgment of the district court.

AFFIRMED.

STACY, J., concurring.

Although I agree with the majority's resolution of the assigned errors, I write separately to address what I consider to be plain error in approving the "Default Parenting Plan" and incorporating it into the decree.

An appellate court may, at its option, notice plain error.[1] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[2] As I explain, I think it was plain error to approve the default parenting plan because it failed to conform to the requirements of the Parenting Act[3] and it improperly delegated to Tania the judicial duty to determine the specific terms and conditions of Emilio's parenting time.

### PARENTING PLAN REQUIREMENTS

Section 43-2929(1) addresses the contents of parenting plans in Nebraska and provides in relevant part:

[1] *Tyler F. v. Sara P.*, 306 Neb. 397, 945 N.W.2d 502 (2020).

[2] *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023).

[3] Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2022).

In any proceeding in which parenting functions for a child are at issue under Chapter 42, a parenting plan shall be developed and shall be approved by the court. Court rule may provide for the parenting plan to be developed by the parties or their counsel, a court conciliation program, an approved mediation center, or a private mediator. When a parenting plan has not been developed and submitted to the court, the court shall create a parenting plan in accordance with the Parenting Act. A parenting plan shall serve the best interests of the child . . . and shall:

. . . .

(b) Include, but not be limited to, determinations of the following:

(i) Legal custody and physical custody of each child;

(ii) Apportionment of parenting time, visitation, or other access for each child, including, but not limited to, specified religious and secular holidays, birthdays, Mother's Day, Father's Day, school and family vacations, and other special occasions, specifying dates and times for same, or a formula or method for determining such a schedule in sufficient detail that, if necessary, the schedule can be enforced in subsequent proceedings by the court, and set out appropriate times and numbers for telephone access.

Similarly, § 43-2935 addresses the court's responsibility when one or both parents submit a parenting plan for the court's consideration:

After a hearing on the record, the court shall determine whether the submitted parenting plan meets all of the requirements of the Parenting Act and is in the best interests of the child. If the parenting plan lacks any of the elements required by the act or is not in the child's best interests, the court shall modify and approve the parenting plan as modified, reject the parenting plan and order the parties to develop a new parenting plan, or reject the parenting plan and create a parenting plan that meets

all of the required elements and is in the best interests of the child.

In light of the above statutory requirements, we have emphasized that whether parents have mediated or otherwise agreed on a parenting plan, or whether the issues of custody and parenting time are disputed, "the court is required to independently determine that any parenting plan being ordered is in the child's best interests and must reject or modify parenting plans that are not in the child's best interests or which do not meet the requirements of the Parenting Act."[4] This judicial responsibility cannot be controlled by an agreement or stipulation of the parties,[5] and it cannot be delegated.[6]

### "Default Parenting Plan"

Here, the provisions of the default parenting plan submitted by Tania and ultimately approved by the court stated, in full:

---

[4] *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 955, 932 N.W.2d 692, 709 (2019). See, also, §§ 43-2921, 43-2923(4) and (6), and 43-2935.

[5] See *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018).

[6] See, e.g., *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019) (recognizing that court's authority to determine parenting time is judicial function that cannot be delegated); *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988) (decree authorizing child support officer to control custody and parenting time was improper delegation of judicial authority), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T., supra* note 4; *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980) (order authorizing psychologist to determine scope of noncustodial parent's visitation was improper delegation of judicial duty), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002); *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014) (order giving each parent discretion to withhold visitation from other amounted to unlawful delegation of trial court's duty to establish visitation); *Mark J. v. Darla B.*, 21 Neb. App. 770, 842 N.W.2d 832 (2014) (court abused its discretion by ordering that custodial parent had discretion to determine terms and conditions of parenting time); *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995) (order giving psychologist authority to determine time, manner, and extent of parenting time was improper delegation of judicial authority).

[Emilio] (defaulting parent) is in default for failing to comply with Court Rule 4.3 requiring participation in the parent education class and mediation for purpose of establishing a parenting plan. [Tania] (custodial parent) shall have custody of the minor child/ren of the parties. The visitation and parenting time of [Emilio] (defaulting parent) shall be at the sole discretion of [Tania] (custodial parent) until such time as [Emilio] (defaulting parent) complies with Rule 4.3 by attending the parent education class and by either mediating or negotiating a parenting plan, which has been approved by the Conciliation Court and Mediation Services.

Although the terms of the default parenting plan suggest it was perhaps intended as a temporary placeholder to guide the parties until a more specific plan could be developed for the court's consideration, this version was submitted to and expressly approved by the court at the final hearing and thereafter was incorporated into the decree.

To the extent the approved parenting plan purports to give Tania "sole discretion" to determine whether and when Emilio can exercise parenting time with the parties' minor child, it represents an improper and unlawful delegation of judicial authority.[7] Moreover, because the approved parenting plan provides no specific detail regarding dates, times, or methods for determining a parenting time schedule for Emilio, there is no practical way it could be enforced by the court in a subsequent proceeding.

I would find the court plainly erred when it expressly found the default parenting plan "complies with the Parenting Act and is in the best interest of the minor child." Moreover, leaving this issue uncorrected would, in my opinion, result in damage to the integrity and fairness of the judicial process

---

[7] See, *VanSkiver v. VanSkiver, supra* note 6; *Ensrud v. Ensrud, supra* note 6; *Deacon v. Deacon, supra* note 6; *Barth v. Barth, supra* note 6; *Mark J. v. Darla B., supra* note 6; *In re Interest of Teela H., supra* note 6.

and would be contrary to the best interests of the child. I would therefore vacate that portion of the decree that approved and incorporated the default parenting plan, and I would remand the cause to the district court with instructions to either modify and approve the parenting plan as modified, reject the parenting plan and order the parties to develop a new parenting plan, or reject the default parenting plan and create a parenting plan that meets all the requirements of the Parenting Act and is in the best interests of the child.[8]

---

[8] See, generally, §§ 43-2929 and 43-2935(1).